960 P.2d 1218

Dr. Harold STEINBERG,
Appellant–Appellant,

v.

William D. HOSHIJO, Executive Director, Hawai'i Civil Rights Commission, Appellee–Appellee.

No. 21019.

Supreme Court of Hawai'i.

June 18, 1998.

Reconsideration Denied July 1, 1998.

Wesley K.C. Lau, on the briefs, Kaneohe, for Appellant-Appellant.

John Ishihara, on the briefs, Honolulu, for Appellee-Appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Appellant-appellant Dr. Harold Steinberg appeals from the first circuit court's September 19, 1997 order affirming the final decision of the Hawai'i Civil Rights Commission (HCRC) in this sexual harassment case. The HCRC concluded in its final decision that Dr. Steinberg had subjected employee-complainant Linda Louise Gould to unwelcome sexual conduct and thereby created an intimidating, hostile, and offensive work environment,. in violation of Hawai'i Revised Statutes (HRS) § 378–2(1)(A) (1993) and Hawai'i Administrative Rules (HAR) § 12–46–109(a)(3) (1990). Gould was awarded $40,000 in compensatory damages and $20,000 in punitive damages.

On appeal, Dr. Steinberg asserts that: (1) the HCRC failed to timely issue its reasonable cause determination as to the existence of an unlawful discriminatory practice; (2) the hearings examiner abused her discretion by ordering that Gould be deposed via telephone rather than in person; and (3) there was insufficient evidence to support the HCRC's final decision. Because Dr. Steinberg's claims lack merit, we affirm the circuit court's order. Each of Dr. Steinberg's points of error is discussed, seriatim, *infra* in section III.

## I. BACKGROUND

Kailua Family and Urgent Medical Care [hereinafter, the Clinic] in Kaneohe, Hawai'i, specializes in walk-in urgent care and is open seven days a week, from 8:00 a.m. to 8:00 p.m. The medical director in charge of the Clinic's operations is Robert Simich, M.D. (Dr. Simich). Among other things, Dr. Simich hires doctors, medical assistants, and receptionists to staff the Clinic.

Doctors and medical assistants employed at the Clinic generally work two to three twelve-hour-shifts per week; usually, there is one doctor on duty per shift. During his or her shift, the doctor on duty is in charge of the Clinic and supervises the medical assistants and receptionists in treating patients. The medical assistants and receptionists are also supervised by the chief medical assistant, who schedules employees, conducts work performance evaluations, handles employee complaints, and oversees the cleaning and stocking of supplies and equipment.

On June 29, 1990, Dr. Simich hired Dr. Steinberg as a physician and surgeon at the Clinic. During his shifts and as the doctor on duty, Dr. Steinberg ran the Clinic and supervised the receptionists and medical assistants. Sometime in September 1991, Gould moved to Honolulu, Hawai'i. Having been previously certified as an emergency medical technician on the mainland, Gould sought employment at the Clinic, and, on September 26, 1991, she was hired by Dr. Simich as a medical assistant. Gould worked three twelve-hour-shifts per week at the Clinic and, during most of her employment, worked two shifts per week with Dr. Steinberg.

When there were no patients at the Clinic, the work atmosphere was informal and, at

times, even unprofessional and juvenile. During these slow periods, the doctor and medical assistants would congregate in the laboratory equipment room[1] and "talk story," eat, do crossword puzzles, or play cards together. On two occasions, rubber band fights broke out among the staff.

During Gould's employment at the Clinic, Dr. Steinberg subjected Gould and other female employees to the following sexual conduct:

(a) Dr. Steinberg often listened to the Rush Limbaugh radio show during which sexist or derogatory statements were sometimes made about women. Dr. Steinberg would often turn the radio up louder or state his agreement with such comments.

(b) When female staff went to use the restroom, Dr. Steinberg remarked on at least two occasions, "Why women don't pee in the shower like men?" Additionally, once, when a woman took her purse to the restroom, Dr. Steinberg snickered and remarked, "There's only one reason why a woman would take her purse into the restroom."

(c) Dr. Steinberg regularly commented about the breast sizes of employees, patients, and celebrities mentioned on radio talk shows, saying things like: "She's really stacked"; "I don't know why everybody thinks she's so great— she's got nothing up here"; and "Did you see the knockers on her?" He also regularly discussed the large breasts of a medical school acquaintance and how they "got in the way."

(d) On a weekly basis, Dr. Steinberg made remarks about female employees' nipples, saying something like, "Is it cold in here?" or "Are you excited to see me?"

(e) On at least ten occasions, Dr. Steinberg snapped Gould's bra strap from behind as he walked passed her. One time, he also snapped the bra strap of Debbie Choike, a receptionist. After snapping Choike's bra strap, Dr. Steinberg asked Choike the way "to get a proper fit in a bra." Additionally, Dr. Steinberg once commented to Gould regarding the type of bras he thought female employees should wear because of their breast sizes.

(f) Dr. Steinberg also commented about patients' intimate body parts. Once, Dr. Steinberg commented that a former patient was attractive, but would be better looking if she "took quite a bit off of that ass of hers." Once, Dr. Steinberg stated that a patient had "huge fucking thighs," remarking further, "How's the guy supposed to get in there with thighs like that?"

(g) On at least two occasions, Dr. Steinberg suggested that the medical assistants and receptionists wear sexier clothing, such as short skirts and tighter blouses.

(h) A few times, Dr. Steinberg threw paper clips and pins, and shot small rubber bands at Gould; when the objects would hit her breast or crotch areas, Dr. Steinberg would say, "Oh, got it on target there!"

(i) On one occasion, Dr. Steinberg dropped something down the front of Gould's shirt and laughed.

(j) Dr. Steinberg would often rub against Gould when he passed her in the lab area. To create a buffer zone between herself and Dr. Steinberg, Gould would turn around and put her arms in front of her.

Dr. Steinberg did not subject similarly situated male employees to such sexual conduct.

Gould was shocked by Dr. Steinberg's conduct; she had never heard anyone speak about or treat women in such a derogatory manner. At first, Gould tried to ignore Dr. Steinberg's conduct, hoping it would stop. Later, Gould responded to some of the incidents, stating, "Doctor, that's offensive." Dr. Steinberg, however, would laugh and, apparently, not take her objections seriously. Once, Gould told Dr. Steinberg, "This would really be considered sexual harassment." Dr. Steinberg laughed and replied, "It can't

---

1. At the Clinic, neither doctors nor medical assistants had their own individual office or station.

be sexual harassment—you're a dyke,[2] how could I sexually harass you? That can't happen."

Sometime prior to December 26, 1991, Gould complained to chief medical assistant Pearl Popiak that Dr. Steinberg's comments and actions were offensive and made her feel uncomfortable. Gould did not, however, provide any specific examples. Popiak did not understand what Gould was complaining about, stating something to the effect that, "Well, you know that, you are a medical assistant. The doctors, it's just their way to tell you what to do."

On December 26, 1991, Dr. Steinberg and Popiak conducted an evaluation of Gould's job performance. As part of the evaluation, Gould filled out an appraisal sheet that posed several questions related to job satisfaction. Question No. 2 of the appraisal sheet asked, "What do you like the least about your job?" Gould responded in part, "The radio played in the back office." Gould did not respond to Question No. 5 which asked, "Do you feel you have opportunities to express your ideas about our policies and procedures?" Finally, Gould did not express any complaints regarding Dr. Steinberg's conduct in response to Question Nos. 6 and 7 which asked, respectively, "What suggestions do you have to improve our clinic?" and "Is there something specific you would like to discuss about your job?"

In other words, at the time of her evaluation, Gould did not make any allegations of sexual harassment against Dr. Steinberg, nor did she otherwise complain about Dr. Steinberg. At the HCRC hearing, Gould stated that she did not voice any complaints because she was afraid that she might be fired if she complained, and, furthermore, that she was not sure whether Dr. Steinberg's conduct constituted sexual harassment.

Gould also did not report Dr. Steinberg's sexual conduct to Dr. Simich. According to Gould, when Dr. Simich was at the Clinic, he usually acted "gruff, crabby, and unapproachable" towards the staff. Gould felt he gave orders to employees "the way he would give orders to . . . a dog." Believing that Dr.

Simich would not be receptive to her complaint, Gould chose not to report to Dr. Simich about Dr. Steinberg. Because Dr. Simich did not work with Dr. Steinberg and was seldom at the Clinic, Dr. Simich never observed or learned of Dr. Steinberg's offensive conduct.

Dr. Steinberg's conduct had the alleged following negative impact on Gould. While at work, Dr. Steinberg's conduct made Gould tense and anxious, causing her to have headaches. Furthermore, Gould felt embarrassed and humiliated whenever Dr. Steinberg snapped her bra strap. After work, Gould was angry, tense, irritable, and tired; she would also experience knots in her stomach, constipation, or diarrhea when she was at home. Gould began to snap at her life partner, Maggie Tanis, and they started to fight over household matters and whether Gould should continue to work at the Clinic. Gould stated that, although Tanis wanted her to leave the Clinic, she wanted to stay because she was learning about post-emergency care treatment. Additionally, because her objections expressed directly to Dr. Steinberg and her complaint to Popiak did not change the offensive conditions at the Clinic, Gould began to feel powerless and started to lose her self-confidence. Gould also lost interest in socializing with friends. She often cried before going to work because she did not want to work with Dr. Steinberg.

In late February or early March 1992, Gould believed that she could no longer bear Dr. Steinberg's conduct and began searching for another job. On April 4, 1992, while Gould was still employed at the Clinic, Dr. Steinberg left the Clinic to start his own practice. Nevertheless, Dr. Steinberg continued to visit the Clinic and would socialize with the employees in the receptionist and laboratory equipment areas. Gould therefore continued to seek other employment.

On or about April 11, 1992, Gould accepted a medical assistant position in Pearl City with James Miller, M.D. (Dr. Miller) and informed the Clinic that she would quit in two weeks. Feeling it unnecessary to dis-

---

2. Notwithstanding the fact that Gould is a lesbian, Gould claimed sexual harassment on the basis of her status as a woman, not her sexual orientation.

close the real reason behind her leaving, Gould told the Clinic staff that she wanted to work closer to home and had found a better paying job. On April 25, 1992, Gould left her job at the Clinic. Sometime thereafter in 1992, Gould relocated to San Francisco, California.

On October 20, 1992, Gould filed a complaint with the HCRC against, *inter alia*, the Clinic, Dr. Simich, and Dr. Steinberg, alleging sexual harassment and constructive discharge. Following an HCRC investigation into Gould's allegations, Executive Director Linda C. Tseu, on January 25, 1995, filed a determination that there was reasonable cause to believe a discriminatory practice had occurred. On October 2, 1995, the complaint was docketed as *Tseu v. Simich Associates, Inc.*, No. 95–012–E–SH. Executive Director Tseu pursued the complaint on behalf of Gould.

The case was initially set for hearing the week of March 30, 1996 before Hearings Examiner Livia Wang. However, following a scheduling conference before Hearings Examiner Wang on November 1, 1995, the HCRC extended the hearing date to the week of April 1, 1996. Prior to the hearing, the following pertinent events occurred.

On November 9, 1995, Dr. Simich and Dr. Steinberg moved for summary judgment on the grounds that the Executive Director had failed to issue a reasonable cause determination within one hundred eighty days of the date the complaint was filed. On November 24, 1995, Hearings Examiner Wang denied that motion.

On or about February 9, 1996, Dr. Steinberg noticed the taking of Gould's deposition for March 1, 1996, in Hawai'i. Because Gould was residing in California and neither she nor the HCRC could afford the expense of Gould's plane fare to Hawai'i for the deposition, the Executive Director suggested to Dr. Steinberg that Gould be deposed via telephone; Dr. Steinberg refused. Thereafter, on February 12, 1996, the Executive Director moved for a protective order as to the location of Gould's deposition, claiming undue burden and expense and requesting

that Gould's deposition be taken by telephone. Finding that Gould had shown good cause for not being required to attend her deposition in Hawai'i, Hearings Examiner Wang ordered that Dr. Steinberg take her deposition by telephone conference. In the end, Dr. Steinberg chose not to take Gould's deposition.

A contested case hearing was held before Hearings Examiner Wang on April 1 and 2, 1996. Gould was present and testified at the hearing. On June 20, 1996, Hearings Examiner Wang issued her Findings of Fact, Conclusions of Law, and Recommended Order. Therein, Hearings Examiner Wang recommended that the HCRC conclude, *inter alia*, that: (1) Dr. Steinberg violated HRS § 378–2 and HAR § 12–46–109 by subjecting Gould to unwelcome sexual conduct which created a hostile work environment; (2) Dr. Simich was similarly liable under a theory of respondeat superior pursuant to HAR § 12–46–109(c); (3) the Executive Director did not err in failing to issue a reasonable cause determination within one hundred eighty days; (4) Dr. Steinberg was not improperly ordered to take Gould's deposition via telephone; and (5) Gould had not been constructively discharged. Hearings Examiner Wang further recommended that Dr. Simich and Dr. Steinberg pay Gould, jointly and severally, $40,000 in compensatory damages and that Dr. Steinberg pay Gould $20,000 in punitive damages.

Neither Dr. Steinberg nor Dr. Simich filed any written exceptions to Hearings Examiner Wang's recommended decision. On September 25, 1996, the HCRC heard oral argument from counsel for Dr. Steinberg and counsel for the Executive Director. (Just a few days prior to oral argument, the Executive Director and Dr. Simich reached a settlement,[3] prompting the Executive Director to request that the HCRC dismiss Dr. Simich, formerly d.b.a. Dr. Robert L. Simich and Associates, also formerly d.b.a. Kailua Family and Urgent Medical Care, from the case.)

Dr. Steinberg maintained at oral argument before the HCRC that none of the alleged conduct had occurred and that Gould was

---

3. The terms of settlement are not contained in the record.

lying. Aside from a blanket denial, Dr. Steinberg did not provide the HCRC with any basis to reject Hearings Examiner Wang's proposed findings of fact regarding his conduct. Thus, on October 29, 1996, the HCRC issued its final decision, wherein it agreed with Hearings Examiner Wang that: (1) Dr. Steinberg had violated HRS § 378-2(1)(A) and HAR § 12-46-109(a)(3) by subjecting Gould to unwelcome sexual conduct, which created a hostile work environment; (2) the Executive Director did not err in failing to issue a reasonable cause determination within one hundred eighty days; and (3)the hearings examiner did not err in not requiring Gould to be present in Honolulu for her deposition. The HCRC further ruled that the issue whether Gould had been constructively discharged was moot. Finally, the HCRC adopted, without modification, Hearings Examiner Wang's recommended award of damages.

Dr. Steinberg thereafter appealed to the circuit court.[4] On September 19, 1997, the circuit court affirmed the HCRC's final decision. This timely appealed followed.

## II. *STANDARD OF REVIEW*

 Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) to the agency's decision. This court's review is further qualified by the principle that the agency's decision carries a presumption of validity and [the party seeking to reverse the agency's decision] has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

HRS § 91-14(g) (19[93]) provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse

or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of this [sic] agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

. . . .

Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6). Accordingly, a reviewing court will reverse an agency's finding of fact if it concludes that such agency finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. HRS § 91-14(g)(5). On the other hand, the agency's conclusions of law are freely reviewable.

*Hardin v. Akiba*, 84 Hawai'i 305, 309-10, 933 P.2d 1339, 1343-44 (1997) (citations and some brackets omitted).

## III. *DISCUSSION*

A. *The HCRC's Reasonable Cause Determination As To The Existence Of An Unlawful Discriminatory Practice Was Properly Made, In Accordance With Statute.*

 HRS § 368-13 (1993) governs the HCRC's investigation and conciliation of a complaint, providing in pertinent part that:

---

4. While the case was pending on appeal before the circuit court, William D. Hoshijo replaced Linda C. Tseu as Executive Director of the HCRC. Hoshijo was therefore substituted for Tseu as a party pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 25(d)(1) (1996).

(a) *After the filing of a complaint, or whenever it appears to the commission that an unlawful discriminatory practice may have been committed, the commission's executive director shall make an investigation in connection therewith....*

(b) *The executive director shall issue a determination of whether or not there is reasonable cause to believe that an unlawful discriminatory practice has occurred within one-hundred and eighty days from the date of filing a complaint unless the commission grants an extension of time to issue a determination.*

(Emphases added.)

The practice and procedure of the HCRC is further governed by HAR, title 12, chapter 46, Civil Rights Commission, HAR. Like HRS § 368–13, HAR § 12–46–12(f) (1992) provides that "[a]n investigation shall be concluded within one hundred eighty days of the filing of the complaint; *provided that the commission may grant an extension.*" (Emphasis added.)

The HCRC formally began its operations on January 2, 1991, assuming jurisdiction over 266 employment discrimination complaints that had been filed previously with the Department of Labor and Industrial Relations. Burdened with a heavy caseload, the HCRC was unable to complete its investigations and issue reasonable cause determinations within one hundred eighty days, as provided for by the HRS and HAR.[5] Thus, beginning in March 1993, the HCRC voted to implement four incremental extensions of the time in which to investigate all cases.[6] Gould's complaint was filed on October 20, 1992, and the investigation of Gould's complaint was thereafter extended four times before the Executive Director made her reasonable cause determination on January 25, 1995.

Dr. Steinberg contends that the HCRC "failed to meet the technical requirements of [HRS § 368–13(b)]." Citing no authority, Dr. Steinberg submits that:

The HCRC's minutes use language like "to extend the period of investigation for all complaints" or "extended the time for the investigation of all cases". The HCRC minutes do not use the statutory requirement of "an extension of time to issue a determination". The difference in purpose is not the same[;] to investigate means that there is more work to be done to find out the facts as they are, and to make a determination means that the Executive Director has sufficient facts, but is unable to finalize a decision and to put it into writing.

In the instant case the HCRC did not grant an extension of time to issue a determination. It granted a number of extensions, four in this case ..., of time to investigate all cases. While this may be nit-picking, it comes closer to the intent of the legislature in establishing a time limitations on actions....

Dr. Steinberg's claims are patently meritless. Read *in pari materia*, HRS § 368–13(f) and HAR § 12–46–12(f) clearly authorize the HCRC to extend the time to complete an investigation of a complaint before making a reasonable cause determination. Additionally, based on the plain language of both the HRS and the HAR, the number of extensions that may be granted is not limited. Inexplicably, Dr. Steinberg attempts to treat HRS § 368–13(b) as analogous to a statute of limitations provision. Nonetheless, we are unaware of any case law, legislative history, or other authority that supports such a proposition. Indeed, the legislative history is completely silent as to the intent of permitting extensions of investigations.[7]

---

5. At one point, the number of HCRC pending cases reached as high as 642 cases.

6. The first was granted on March 18, 1993, extending the time for investigating all complaints to December 31, 1993. On December 13, 1993, the HCRC voted in favor of a second extension to investigate all cases to June 30, 1994. A third extension was thereafter granted on June 8, 1994, extending investigation of all cases to December 31, 1994. Finally, on December 14, 1994, the HCRC voted in favor of a fourth extension to investigate all cases to June 30, 1995.

7. Of course, logically, the intent of allowing extensions of investigations was to provide the HCRC with sufficient time to conduct and complete its investigations before making a determination as to reasonable cause.

■ In the absence of "a clearly expressed legislative intention to the contrary, [the language of the statute] must ordinarily be regarded as conclusive." *Kaiama v. Aguilar,* 67 Haw. 549, 553, 696 P.2d 839, 842 (1985) (citation omitted). Accordingly, we hold that the HCRC did not exceed its statutory authority under HRS § 368–13(b) and HAR § 12–46–12(f) by granting four extensions of the investigation into Gould's complaint. Thus, the Executive Director's reasonable cause determination as to the existence of unlawful discriminatory conduct was timely made.

B. *The Hearings Examiner Did Not Abuse Her Discretion In Ordering That Gould's Deposition Be Taken By Telephone.*

■ Dr. Steinberg next claims that the hearings examiner abused her discretion in ordering that Gould be deposed via telephone conference instead of in person.

Pursuant to HAR § 12–46–32 (1990), a hearings examiner is empowered "[t]o allow and supervise discovery as deemed reasonable and necessary." In the instant case, Hearings Examiner Wang treated the Executive Director's February 12, 1996 motion dually—as a motion for a protective order, pursuant to HRCP Rule 26(c) (1990),[8] and as a motion to have Gould's deposition taken by telephone pursuant to HRCP Rule 30(b)(7) (1990).[9] Upon a finding of good cause, Hearings Examiner Wang ordered that should Dr. Steinberg elect to take Gould's deposition, it would be by telephone conference. To allow Steinberg's attorneys to evaluate Gould as a witness, Hearings Examiner Wang further ordered that, during the deposition, Gould should utilize a speaker phone and "videotape herself listening to and answering the questions propounded to her during the deposition and . . . look at the video camera while listening and responding to the questions."

The record evinces that there was good cause for Hearings Examiner Wang to order that Gould be deposed via telephone rather than in person. At the time her deposition was noticed, Gould was residing in California and had already made plans to take leave from work to attend the contested case hearing the week of April 1, 1996. Gould was unable to take additional leave from work in order to travel to Hawai'i to attend the deposition, and neither she nor the HCRC had funds to pay for a trip to Hawai'i to attend a deposition.

Dr. Steinberg nonetheless surmises that, "[i]f a face-to-face deposition had taken place, the credibility of the witness could have been more fully ascertained. As it stood the witness/accuser was able to increase substantially the specificity of her case from the time of inception to the hearing." However, the fact remains that, in the end, it was Dr. Steinberg who opted not to have Gould deposed at all. Thus, it is impossible for the court to assess the nature of any prejudice Dr. Steinberg may or may not have suffered as a result of the order for a telephonic deposition. We therefore reject Dr. Steinberg's contentions.

C. *There Was Sufficient Evidence To Support The HCRC's Decision.*

HRS § 378–2(1)(A) provides in pertinent part:

Discriminatory practices made unlawful; offenses defined. It shall be an unlawful discriminatory practice:

(1) Because of race, sex, sexual orientation, age, religion, color, ancestry,

---

8. HRCP Rule 26(c) provides that:

Protective orders. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the circuit where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, *or undue burden or expense,* including one or more of the following: . . . (2) that discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery[ ]. . . .
(Emphasis added.)

9. HRCP Rule 30(b)(7) provides that "[t]he parties may stipulate in writing or the court may upon motion order that a deposition be taken by telephone."

disability, marital status, or arrest and court record:

 (A) For any employer[10] to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]

Pursuant to HAR § 12–46–109, sexual harassment on the basis of sex is a violation of chapter 378 of the HRS. Specifically, HAR § 12–46–109 provides in pertinent part:

Sexual Harassment. (a) Harassment on the basis of sex is a violation of chapter 378, HRS. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or visual forms of harassment of a sexual nature constitute sexual harassment when:

 . . . .

 (3) That conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment

■ To restate, a claim for "hostile environment"[11] sexual harassment exists when an employee can show (1) that he or she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, (2) that this conduct was unwelcome, and (3) that the conduct had the purpose or effect of either (a) unreasonably interfering with an individual's work performance or (b) creating an intimidating, hostile, or offensive work environment. In determining whether alleged conduct constitutes sexual harassment, HAR § 12–46–109(b) instructs the HCRC to "look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." Additionally, the perspective to be used is that of the victim. *Oncale v. Sundowner Offshore Servs., Inc.,* —— U.S. ——, ——, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998); *Ellison,* 924 F.2d at 878. Thus, if the complainant is a woman, the objective standard is met if a reasonable woman would consider such conduct sufficiently severe or pervasive to alter the conditions of employment and either unreasonably interfere with work performance or create an intimidating, hostile, or offensive work environment. *See Ellison,* 924 F.2d at 879.

■ Dr. Steinberg contends that there was insufficient evidence to support the HCRC's determination that he subjected Gould to unwelcome sexual conduct and thereby created an intimidating, hostile, and offensive work environment, in violation of HRS § 378–2(1)(A) and HAR § 12–46–109(a)(3). He argues that "[t]he Circuit Court was wrong in not reversing the decision of HCRC based on the credibility of the witnesses and in view of the reliable, probative and substantial evidence on the whole record." It is well settled, however, that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence. *See Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 117, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Indeed, in reviewing agency cases, "courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the

---

**10.** HRS § 378–1 (1993) defines "employer" as "any person, including the State or any of its political subdivisions and any agent of such person, having one or more employees...." The parties do not dispute that Dr. Steinberg was an agent of the Clinic and therefore an "employer" as defined by HRS § 378–1.

**11.** Under Title VII, the United States Supreme Court and the federal courts have recognized two types of sexual harassment, "quid pro quo" cases and "hostile environment" cases. *See, e.g., Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Ellison v. Brady,* 924 F.2d 872 (9th Cir.1991); *Kauffman v.*

*Allied Signal, Inc., Autolite Div.,* 970 F.2d 178 (6th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992). In "quid pro quo" cases, employers condition employment benefits on sexual favors. *Ellison,* 924 F.2d at 875. In "hostile environment" cases, employees work in offensive or abusive environments. *Id.*

Similarly, HAR § 12–46–109 provides for protection against both "quid pro quo" and "hostile environment" forms of sexual harassment. *See* HAR § 12–46–109(a)(1), (2), and (3). We therefore adopt the term "hostile environment" to refer to sexual harassment under HAR § 12–46–109(a)(3).

administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony[ ]...." *In re Application of Hawaiian Electric Co., Inc.,* 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (citation omitted).

Having reviewed the record, we hold that there was substantial, probative evidence to support the HCRC's decision. First, as detailed in section II.A, *supra,* the record contains numerous instances of both physical and verbal conduct of a sexual nature. For example, Dr. Steinberg touched Gould in a sexual manner by rubbing up against her when passing her in the narrow laboratory. Dr. Steinberg snapped Gould's bra strap from behind at least ten times. On one occasion, Dr. Steinberg put an object down the front of Gould's shirt. Dr. Steinberg regularly commented about breasts and intimate body parts of employees, celebrities, friends, and patients. He made inappropriate, gratuitous comments about urination and menstruation by female employees. At least twice, Dr. Steinberg said that medical assistants and receptionists should wear sexier clothing, like short skirts and tighter blouses.

Second, it is undisputed that Gould never solicited or incited Dr. Steinberg's conduct, and the record further supports that his behavior was unwelcome. Gould told Dr. Steinberg that she felt his verbal comments were offensive and inappropriate and that his behavior could be considered sexual harassment. Choike observed Gould being tense, red-in-the-face, upset, and fed up after some of the incidents. Tanis also observed that Gould was upset and angry when she complained about Dr. Steinberg's behavior. Additionally, Dr. Steinberg's conduct made Gould tense and anxious and caused her to have headaches. Gould also felt humiliated and embarrassed when Dr. Steinberg snapped her bra strap.

Lastly, the record evinces that Dr. Steinberg's conduct had the effect of creating an intimidating, hostile, and offensive working environment. As illustrated above, Dr. Steinberg's conduct was sufficiently severe and pervasive that a reasonable woman could certainly consider the conditions of employment altered, thereby creating an intimidating, hostile, and offensive work environment.

■ The HCRC's decision carries a presumption of validity, and the party seeking to reverse the agency's decision has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences. *See Hardin,* 84 Hawai'i at 310, 933 P.2d at 1344 (citation omitted). Apart from attacking Gould's credibility, Dr. Steinberg offers no other argument to substantiate his claim that there was insufficient evidence to support the HCRC's decision. Because Dr. Steinberg fails to meet his burden and the record clearly supports that Gould was subjected to hostile environment sexual harassment as a result of Dr. Steinberg's offensive conduct, we reject Dr. Steinberg's claim.[12]

## IV. CONCLUSION

For the foregoing reasons, we affirm the first circuit court's order of September 19, 1997.

---

**12.** We note that Dr. Steinberg has never challenged—neither before the HCRC, the circuit court, nor on appeal before this court—the legitimacy of the HCRC's award of compensatory or punitive damages. Because, pursuant to HRS § 368–17(a) (1993), the HCRC had the authority to award both compensatory and punitive damages, and we do not perceive any evidence of plain error, we hold that the issue of damages was waived. Hawai'i Rules of Appellate Procedure Rule 28(b)(4) (1995).