Edith Laraine **MUKAIDA**, Plaintiff,

v.

State of **HAWAII**; University of Hawaii; Norman Okamura; and Doe Defendants 1–20, Defendants.

No. 99–00419 SOM/LEK.

United States District Court, D. Hawai'i.

July 12, 2001.

Emlyn H. Higa, Honolulu, HI, for plaintiff.

Gary K.H. Kam, Deputy Attorney General, Dean D. Choy, Evelyn H. Nowaki, Office of General Counsel, University of Hawaii, Carolyn Schnack, Bickerton Saunders & Dang, Honolulu, HI, for defendants.

*ORDER GRANTING DEFENDANT STATE OF HAWAII'S AND DEFENDANT UNIVERSITY OF HAWAII'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT NORMAN OKAMURA'S MOTION FOR SUMMARY JUDGMENT*

MOLLWAY, District Judge.

## I. INTRODUCTION.

Plaintiff Edith Laraine Mukaida ("Mukaida") had a sexual relationship with Defendant Norman Okamura ("Okamura") while they were both employed by Defendant University of Hawaii ("UH"). After that relationship ended, Mukaida claimed that she had been sexually harassed and that she was the victim of various torts by Okamura. Mukaida filed the present action against Okamura, both in his individual and official capacities, UH, and Defendant State of Hawaii (the "State"). Okamura, UH, and the State have filed separate motions for summary judgment.

The essence of the motions is that the alleged sexual harassment and other tortious acts by Okamura occurred during the course of a voluntary relationship between Okamura and Mukaida. Although Mukaida's opposition memoranda failed to identify any admissible evidence indicating that Okamura's actions were not consensual, the court has discovered several statements in her answers to interrogatories, submitted as exhibits, that raise a question of fact regarding whether some of Okamura's contacts were "unwelcome." [1] Given the immense amount of evidence introduced, as well as Mukaida's admission at the hearing that she and Okamura had had a consensual physical relationship for some time, the few references in her answers to interrogatories regarding the "unwelcome" nature of Okamura's may ultimately be unpersuasive at trial. However, it is not this court's function to make credibility determinations on these motions. Accordingly, the court determines that the evidence, viewed in the light most favorable to Mukaida, indicates that there is at least a factual dispute about whether some, but not all, of Okamura's alleged contacts were "unwelcome." The court therefore grants the motions in part and denies them in part as follows:

*Count I (Battery) and Count II (Assault):*

With respect to UH and the State, the court has previously dismissed Counts I (battery) and II (assault) of the First Amended Complaint (hereafter "Complaint") on Eleventh Amendment immunity grounds. Because these counts are not being asserted against Okamura in his official capacity, the only parts of Counts I and II that remain are the claims against Okamura in his individual capacity. The

---

1. It was not this court's duty to comb the record for evidence that might support Mukaida's position that Okamura's contacts were unwelcome. *See* Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties"). However, this court did notice, among the voluminous papers submitted by the parties in connection with the motions, Mukaida's statements that certain contacts she allegedly had with Okamura were "unwelcome." Upon discovery of the statements, the court could not simply ignore them and grant summary judgment in favor of the Defendants. The Defendants' own exhibits raised questions of fact regarding the consensual nature of some of Okamura's contacts. The court wishes that Mukaida had assisted the court by specifically pointing these statements out to the court.

court denies the motions to the extent they seek summary judgment in favor of Okamura in his individual capacity, as there is an issue of fact about whether Okamura's actions were "unwelcome," and therefore nonconsensual.

*Count III (Quid Pro Quo Harassment) and Count IV (Hostile Work Environment Discrimination):*

Counts III and IV assert quid pro quo sexual harassment and a hostile work environment, respectively. Both counts are brought under both state and federal statutes. This court has previously dismissed, on Eleventh Amendment immunity grounds, the portions of Counts III and IV raising Mukaida's state law claims, brought under Chapter 378 of Hawaii Revised Statutes, against UH and the State. Because Okamura in his official capacity has the same Eleventh Amendment immunity as the State, the court now dismisses Mukaida's Chapter 378 claims in Counts III and IV to the extent they are being asserted against Okamura in his official capacity.

The court grants summary judgment in favor of UH, the State, and Okamura in his official capacity on the portion of Count III based on Title VII. Mukaida has failed to raise an issue of fact concerning whether she suffered any tangible employment action, which is a predicate for the claim of quid pro quo harassment alleged in Count III.

With respect to hostile work environment claims brought under Title VII in Count IV, summary judgment is granted in favor of UH, the State, and Okamura in his official capacity, as Mukaida unreasonably failed to take advantage of UH's sexual discrimination complaint policy.

With respect to Mukaida's Chapter 378 and Title VII claims against Okamura in his individual capacity, summary judgment is granted in favor of Okamura in his individual capacity because those provi-

sions apply only to employers, not employees. Nothing in the record suggests that Okamura was Mukaida's employer. This leaves no part of Count III or Count IV for further adjudication.

*Count V (Retaliation) and Count VI (Denial of Equal Employment Opportunities):*

Based on Haw.Rev.Stat. § 304–6, the court previously granted summary judgment to the State on the portions of Counts V (retaliation) and VI (denial of equal employment opportunities) relating to acts or omissions allegedly occurring on or after July 1, 1998.

Because Mukaida has failed to raise an issue of fact concerning whether she suffered an adverse employment action or whether she suffered disparate treatment, the court now grants summary judgment in favor of the State to the extent Counts V and VI allege such wrongs based on acts or omissions allegedly occurring before July 1, 1998. For the same reasons, summary judgment is granted in favor of UH on Counts V and VI of the Complaint.

Summary judgment is granted in favor of Okamura in his individual capacity on Counts V and VI because those counts are premised on Title VII, which applies only to employers, not employees.

Because Counts V and VI are not being asserted against Okamura in his official capacity, no part of Counts V or VI remains for further adjudication.

*Count VII (Section 1983) and Count VIII (Section 1985):*

Counts VII and VIII seek relief under sections 1983 and 1985, respectively. This court, on Eleventh Amendment immunity grounds, has previously dismissed the portions of Counts VII and VIII seeking relief from the State for alleged past wrongdoing. Summary judgment was granted in favor of the State on Mukaida's prospec-

tive injunctive relief claims based on Haw. Rev.Stat. § 304–6.

To the extent Mukaida brought section 1983 and 1985 claims against UH based on alleged acts or omissions before July 1, 1998, those claims were also dismissed on Eleventh Amendment immunity grounds. To the extent Mukaida brings section 1983 and 1985 claims based on alleged acts or omissions on or after July 1, 1998, summary judgment is now granted in favor of UH because UH continues to have Eleventh Amendment immunity.

As the court reads Counts VII and VIII, Mukaida's section 1983 and 1985 claims seek relief for alleged violations of Title VII under color of law. Summary judgment is granted in favor of Okamura in his individual capacity based on qualified immunity. To the extent Mukaida seeks prospective injunctive relief against UH, summary judgment is granted in favor of UH, as Mukaida has failed to demonstrate that UH is now violating Title VII under color of law. Moreover, Mukaida has failed to demonstrate any agreement that could form the basis of a conspiracy claim under section 1985.

Because these claims are not being asserted against Okamura in his official capacity, no part of Count VII or VIII remains for further adjudication.

*Counts IX and X (Intentional and Negligent Infliction of Emotional Distress):*

Based on the Eleventh Amendment, the court has previously dismissed the portions of Counts IX and X that alleged that the State had intentionally and negligently inflicted emotional distress on Mukaida. On the same basis, the court has previously dismissed such claims against UH, to the extent those claims related to alleged acts or omissions before July 1, 1998. The court now dismisses Mukaida's emotional distress claims, based on the Eleventh Amendment, to the extent the claims are asserted against UH for alleged acts or omissions on or after July 1, 1998. The court also dismisses emotional distress claims asserted against Okamura in his official capacity, as those claims are barred by the Eleventh Amendment.

This leaves for adjudication Mukaida's emotional distress claims against Okamura in his individual capacity. Because Mukaida's emotional distress claims are based on the same conduct underlying the rest of the Complaint, and because Mukaida's assault and battery claims remain against Okamura in his individual capacity, summary judgment is denied to the extent Okamura in his individual capacity seeks summary judgment on Counts IX and X of the Complaint.

*Count XI (Negligent Retention), Count XII (Negligent Supervision), Count XIII (Negligent Training), and Count XV (Negligent Failure to Remedy Sexual Harassment):*

Counts XI, XII, XIII, and XV are negligence claims. This court has previously dismissed these claims on Eleventh Amendment immunity grounds, to the extent the claims were asserted against the State, as well as against UH for alleged acts and omissions before July 1, 1998. The court now dismisses these claims on Eleventh Amendment immunity grounds to the extent they are alleged against UH for alleged acts or omissions on or after July 1, 1998.

Because Mukaida is not asserting these claims against Okamura in either his individual or official capacity, there are no claims remaining for adjudication in Counts XI, XII, XIII, and XV of the Complaint.

*Count XIV (Aiding and Abetting Discriminatory Practices):*

Count XIV appears to assert a claim under state law for aiding and abetting discriminatory practices. This court has

previously dismissed, on Eleventh Amendment immunity grounds, the portions of Count XIV asserted against the State and asserted against UH for alleged acts and omissions before July 1, 1998. The court now dismisses, on Eleventh Amendment immunity grounds, the portions of Count XIV asserted against UH for alleged acts or omissions on or after July 1, 1998, as well as the portions asserted against Okamura in his official capacity.

To the extent this claim is asserted against Okamura in his individual capacity, the court grants summary judgment in favor of Okamura, as Mukaida has failed to demonstrate any discriminatory practice that Okamura aided and abetted. The concept of aiding and abetting requires some other alleged wrongdoer, and this court's ruling leaves only Okamura as an alleged wrongdoer. Okamura could not be liable for aiding and abetting himself.

*Damages:*

Because the only claims remaining for adjudication are Mukaida's claims against Okamura in his individual capacity for battery, assault, and emotional distress, Defendants are entitled to summary judgment on "Count XVIII" (declaratory relief) and "Count XIX" (injunctive relief), as those damages are not available and are not sought for the remaining claims.

II. *SUMMARY JUDGMENT STANDARD.*

Summary judgment shall be granted when:

> the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see also Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir.2000). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. *See id.* at 323, 106 S.Ct. 2548. A moving party without the ultimate burden of persuasion at trial—usually, but not always, the defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir.2000).

The burden initially falls upon the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv.,* 809 F.2d at 630 (quotation omitted). At least some " 'significant probative evidence tending to support the complaint' " must be produced. *Id. (quoting First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Addisu,* 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact").

"[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987) (*citing Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *accord Addisu,* 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion").

However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv.,* 809 F.2d at 631. All evidence and inferences must be construed in the light most favorable to the nonmoving party. *Id.* Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.[2] *Id.*

## III. *BACKGROUND FACTS.*

Mukaida and Okamura were both employed by UH. Mukaida was the terminal manager of the Pan Pacific Education and Communication Experiments by Satellite ("Peacesat") and an Education Specialist IV in the Social Science Research Institute ("SSRI"). Okamura was an Associate Specialist in SSRI. Both Mukaida and Okamura reported to Donald Topping, and later to Michael Hamnett, director(s) of SSRI. Okamura did not have supervisory authority over Mukaida. Deposition of Donald Topping (April 27, 2001) at 18 (Q: Was there any point in time during your tenure at SSRI where Dr. Okamura was placed in a position of authority over Ms. Mukaida? A: "No"); Declaration of Norman Okamura (May 15, 2001) ¶ 9 ("I did not have any formal or informal authority over Mukaida, and certainly did not have any authority over her work reporting, performance evaluations, vacation leave, sick leave, or any other action such as the time she would report to work") and ¶ 10 ("Topping and Hamnett did not consult with me regarding Mukaida's employment actions or work conditions").

Mukaida and Okamura began a consensual sexual relationship in December 1992 or early 1993. The relationship lasted through most of 1997. *See* Okamura Decl. ¶¶ 25–56. Mukaida does not deny that she had a consensual sexual relationship with Okamura, but she complains about certain acts allegedly committed by Okamura. Defendants argue that these acts occurred during the course of the voluntary sexual relationship between Mukaida and Okamura. *See, e.g.,* Declaration of Norman Okamura (May 15, 2001) ¶¶ 32,48 (containing supposed transcriptions of voicemails from Mukaida to Okamura received from August 1996 to July 1997, telling him that she loved him); Exhibit 9 to Okamura's Motion, at Bates Stamp A00199 (Mukaida's 1996 handwritten note to Okamura, stating: "Lori loves Norman with all her heart and is totally committed to him"); Declaration of Christina Culbertson (May 11, 2001) ¶ 5–6 ("I have only observed a consensual work and personal relationship between Plaintiff and Okamura") ("In 1997, Plaintiff informed me that she intended to marry Okamura"); Declaration of Charles Hill (May 11, 2001) ¶ 6 ("In 1996 or 1997, Lori Mukaida told me that she was in love with Norman Okamura and that they were

---

**2.** The standard of review for a 12(b)(1) motion was set forth in this court's previous order and is incorporated herein by reference.

planning on getting married to each other").

Mukaida contends that Okamura's acts were "unwelcome." However, in opposing the motions, Mukaida failed to point to any admissible evidence in the record supporting that proposition. Instead, Mukaida pointed to evidence of certain activities and only argued that they had been unwelcome. The evidence itself did not clearly indicate unwelcomeness. The court, on its own, discovered clear evidence of unwelcomeness in the form of an interrogatory answer by Mukaida in which she identifies specific incidents that she describes as "[u]nwelcome sexual requests, advances and contact" by Okamura. Plaintiff's Responses to State's Request for Answers to Interrogatories at 5. *See also* Plaintiff's Responses to UH's Request for Answers to Interrogatories at 3.

Mukaida lodged a formal sexual harassment complaint with UH pursuant to its policy and procedures regarding such complaints in July 1998, after her relationship with Okamura had ended.

## IV. *ANALYSIS.*

### A. *UH Continues to Have Sovereign Immunity.*

■ In an earlier ruling in this case, the court held that UH had sovereign immunity from certain claims arising before July 1, 1998, the day Haw.Rev.Stat. § 304–6 (1998) took effect. *See also Hall v. Hawaii,* 791 F.2d 759, 761 (9th Cir.1986) (holding that UH is an agency of the state and therefore immune from suit under the Eleventh Amendment). The Ninth Circuit

previously stated: "Little question exists with respect to the University of Hawaii, the Law School, and the board of regents. They are clearly immune as agencies of the state." *Id.* In prior proceedings in this case, the court did not reach the issue of whether, given statutory amendments, UH continued to have sovereign immunity on and after July 1, 1998. The court now rules that UH continued to have sovereign immunity as an agency of the State.

Under the Eleventh Amendment, a state is immune from suit brought in federal court by its own citizens or citizens of other states. *Papasan v. Allain,* 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Unless a state unequivocally waives sovereign immunity or Congress exercises its power under the Fourteenth Amendment to override that immunity, the state, its agencies, and its officials are immune from suit under the Eleventh Amendment for official actions or omissions. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 66–67, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Hall,* 791 F.2d at 761 ("Absent a state's unequivocal consent, the Eleventh Amendment bars a federal court from entertaining a suit against that state, or one of its agencies or departments, based on state law"); *Shaw v. State of Cal. Dept. of Alcoholic Beverage Control,* 788 F.2d 600, 603 (9th Cir.1986).

The first issue in determining whether UH continues to have Eleventh Amendment immunity is whether, in light of section 304–6 (1998), UH is still an agency of the State.[3] The court concludes that sec-

---

**3.** Section 304–6 states:

 (a) The university may sue and be sued in its corporate name. Notwithstanding any other law to the contrary, all claims arising out of the acts or omissions of the university or the members of its board of regents, its officers, or its employees, including claims permitted against the State under

chapter 661, and claims for torts permitted against the State under chapter 662, may be brought only pursuant to this section, and only against the university. However, the university shall be subject to suit only in the manner provided for suits against the State, including section 661–11, and any liability incurred by the university in such a

tion 304–6 (1998) did not change UH's status as an agency of the State of Hawaii.

■ To determine whether UH is an "arm of the state" and therefore immune from certain suits under the Eleventh Amendment, this court analyzes a number of factors identified by the Ninth Circuit. The most important factor concerns "whether the named defendant has such independent status that a judgment against the defendant would not impact the state treasury." *Jackson v. Hayakawa*, 682 F.2d 1344, 1349 (9th Cir.1982). Other factors include performance by the entity of an essential government function, its ability to sue or be sued, its power to take property in its own name or in the name of the state, and its corporate status. *Id. Accord Mitchell v. Los Angeles Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988), *cert. denied*, 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1989).

Of the five factors this court examines to determine whether UH is an agency of the State for purposes of Eleventh Amendment immunity, Mukaida concedes that only two factors might have changed as a result of the passage of section 304–6—whether a judgment against UH would affect the state treasury and whether UH can sue and be sued. Although section 304–6 (1998) allows UH to be sued and makes claims "payable solely from the moneys and property of the university," section 304–6 did not alter the previous practice under which judgments against UH were paid with State funds. Section 304–6 was amended in 1999 to provide that "[n]othing in this subsection precludes the board of regents from requesting and securing legislative appropriations to fund

settlement of any such claim or judgment against the university, its regents, officers, employees, or agents." Haw.Rev.Stat. § 304–6(b) (Supp.1999). Since that time, the State has continued to appropriate money to settle claims against UH. *See* Act 163, § 1, 2000 Haw.Sess.L. at 325 (appropriating funds for payment of judgments and settlements on claims against UH); Declaration of Eugene S. Imai ¶ 6 ("In every year subsequent to the passage of [section 304–6 (1998) ], the Legislature has appropriated public funds to pay settlements and judgments involving the University"). UH plans to continue to ask the State to pay for settlements and judgments against UH. Imai Decl. ¶ 7 ("I will continue to seek legislative appropriations to pay for settlements and judgments involving the University"). Before section 304–6 was passed, UH had sovereign immunity from certain claims. *See Hall*, 791 F.2d at 761. While section 304–6 now allows UH to be sued, it did not affect any of the other factors that the Ninth Circuit relied on in previously finding that UH was an agency of the State. Accordingly, the court holds that on and after July 1, 1998, the date section 304–6 took effect, UH continued to be an arm of the State for purposes of Eleventh Amendment immunity.

On and after July 1, 1998, UH could be sued in this court in connection with official actions or omissions only if UH had unequivocally waived its sovereign immunity or Congress had exercised its power under the Fourteenth Amendment to override UH's Eleventh Amendment immunity. *See Will*, 491 U.S. at 66–67, 109 S.Ct. 2304; *Hall*, 791 F.2d at 761. Section 304–6 did not unequivocally waive UH's sovereign

---

suit shall be solely the liability of the university, shall be payable solely from the moneys and property of the university, and shall not constitute a general obligation of the State, or be secured directly or indirectly by the full faith and credit of the State or the

general credit of the State, or by any revenue or taxes of the State. All defenses available to the State, as well as all limitations on actions against the State, shall be applicable to the university.
Haw.Rev.Stat. § 304–6 (1998).

immunity.[4] Nor does the legislative history of section 304–6 indicate any intent by the legislature to waive UH's sovereign immunity. In fact, the plain language of the statute appears to be an attempt to preserve UH's sovereign immunity. Section 304–6 specifically provides that "the university shall be subject to suit only in the manner provided for suits against the State." Haw.Rev.Stat. § 304–6(a) (1998 & Supp.1999). It further provides that "[a]ll defenses available to the State, as well as all limitations on actions against the State, shall be applicable to the university." *Id.* Mukaida conceded at the hearing that section 304–6 did not waive UH's immunity. Accordingly, and for the reasons set forth in the previous order, the court finds that UH continues to have sovereign immunity. To the extent Mukaida's claims arising on and after July 1, 1998 were not dismissed because this court had not previously decided whether those claims were barred by the Eleventh Amendment, those claims are now dismissed.[5] More specifically, under the combination of this order and the court's previous order, the following claims against UH are dismissed regardless of whether they concern matters before July 1, 1998, or on or after July 1, 1998: battery (Count I); assault (Count II); quid pro quo harassment based on Chapter 378 of Hawaii Revised Statutes (part of Count III); hostile work environment claims based on Chapter 378 (part of Count IV);

section 1983 claims for remedies other than prospective injunctive relief (Count VII); section 1985 claims for remedies other than prospective injunctive relief (Count VIII); intentional and negligent infliction of emotional distress (Counts IX and X); negligent retention, supervision, and training (Counts XI, XII, and XIII); violation of Chapter 378 by aiding and abetting discriminatory practices (Count XIV); and negligent failure to remedy sexual harassment (Count XV).

The remaining sections of this order address the claims remaining against the other Defendants and the portions of Counts III (quid pro quo harassment based on Title VII), IV (hostile work environment claim based on Title VII), V (retaliation claim based on Title VII), VI (equal employment opportunities claim based on Title VII), VII (prospective injunctive relief under section 1983), and VIII (prospective injunctive relief under section 1985) that are asserted against UH and not governed by the Eleventh Amendment.

B. *Count I (Battery) and Count II (Assault).*

■ Counts I and II allege the common law torts of assault and battery. The only portions of Counts I and II not already disposed of are the claims against Okamura in his individual capacity.[6] The court

4. Mukaida does not argue that Congress waived UH's immunity in any manner relating to section 304–6.

5. These claims are subject to dismissal under Fed.R.Civ.P. 12(b)(1) rather than under Fed.R.Civ.P. 56 because Eleventh Amendment immunity is a component of this court's subject matter jurisdiction. *See Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ("the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court"); *In re Jackson,* 184 F.3d 1046, 1048 (9th Cir.1999) ("Eleventh Amend-

ment sovereign immunity limits the jurisdiction of the federal courts and can be raised by a party at any time during judicial proceedings or by the court sua sponte"). *Accord Blue v. Widnall,* 162 F.3d 541, 544 (9th Cir. 1998); *Charley's Taxi Radio Dispatch v. SIDA of Hawaii,* 810 F.2d 869, 873 n. 2 (9th Cir. 1987); *but see Hill v. Blind Indus. and Servs. of Maryland,* 179 F.3d 754, 760, *as amended,* 201 F.3d 1186 (9th Cir.1999).

6. To the extent these counts were alleged against the State and UH, the court has already dismissed them on Eleventh Amendment immunity grounds. At the hearing, Mu-

denies Okamura's motion for summary judgment in his individual capacity because there is a question of fact regarding whether his contacts with Mukaida were consensual or "unwelcome."

■ A person commits the common law tort of assault if he or she acts with intent to cause another a nonconsensual harmful or offensive contact or apprehension thereof, and the other person apprehends imminent contact. *Garcia v. United States*, 826 F.2d 806, 810 n. 9 (9th Cir.1987); *Burrows v. Hawaiian Trust Co.*, 49 Haw. 351, 360, 417 P.2d 816, 821 (1966) ("Consent is a defense to assault and battery cases as well as to others, unless the consent is against the policy of the law"); *Restatement (Second) of Torts* § 21 (1965) ("An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension").

■ A person commits the common law tort of battery if he or she acts with intent to cause a nonconsensual harmful or offensive contact, or apprehension thereof, and the contact occurs. *Garcia*, 826 F.2d at 810 n. 9; *Ozaki v. Association of Apartment Owners of Discovery Bay*, 87 Hawai'i 273, 289, 954 P.2d 652, 668 (Ct.App.) (stating that a battery is an unlawful touching

of another person without his or her consent), *aff'd in part and rev'd in part on other grounds*, 87 Hawai'i 265, 954 P.2d 644 (1998); *Burrows*, 49 Haw. at 360, 417 P.2d at 821; *Restatement (Second) of Torts* § 18 (1965) ("An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results").

■ A bodily contact is offensive "if it offends a reasonable sense of personal dignity." [7] *Restatement (Second) of Torts* § 19 (1965). Okamura argues that the contacts he had with Mukaida were not offensive because those contacts occurred in the context of a consensual physical relationship between them. That relationship began in December 1992 or early 1993 and lasted through at least the ending part of 1997. Although Mukaida does not deny that she had a consensual relationship with Okamura, she contends that certain contacts with Okamura were "unwelcome." The court finds this contention, sworn to by Mukaida in her interrogatory answers, sufficient to raise a genuine issue of fact regarding the consensual nature of Okamura's contacts. Accordingly, Counts I (battery) and II (assault) of the Complaint remain to the extent they are asserted against Okamura in his individual capacity.[8]

---

kaida clarified that these claims are not being asserted against Okamura in his official capacity.

7. For both her assault and her battery claims, Mukaida complains of "offensive" rather than "harmful" contacts. First Amended Complaint ¶¶ 11 and 15. She says that these contacts occurred before July 1, 1998.

8. Even though it appears that some of the actions underlying the assault and battery claims occurred more than two years before this action was filed, Okamura did not move for summary judgment based on the two-year

statute of limitations applicable to torts. *See* Haw.Rev.Stat. § 657–7 ("Actions for the recovery of compensation for damage or injury to persons or property shall be instituted within two years after the cause of action accrued, and not after"). Because Okamura did not brief this issue, and because Mukaida has not had a chance to point to any doctrine that might toll the statute or otherwise save some or all of her assault and battery claims against Okamura, the court issues no ruling on whether Mukaida's assault and battery claims would be barred by the statute of limitations.

C. *Count III (Quid Pro Quo Sexual Harassment) and Count IV (Hostile Work Environment).*

In the remaining parts of Counts III and IV, Mukaida alleges quid pro quo sexual harassment and hostile work environment sexual discrimination.[9] Both of these counts assert violations of Title VII by all the Defendants and violations of Chapter 378 by Okamura in his individual and official capacities.

1. *There is No Individual Liability Under Title VII.*

■ As an initial matter, Okamura argues that he cannot be individually liable under Title VII. *See Miller v. Maxwell's Int'l. Inc.*, 991 F.2d 583, 587–88 (9th Cir. 1993) ("Congress did not intend to impose individual liability on employees.... If Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees"), *cert. denied*, 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994). *Accord Lenhardt v. Basic Inst. of Tech., Inc.*, 55 F.3d 377, 381 (8th Cir.1995) ("Supervisors and other employees also cannot be held liable under Title VII in their individual capacities"). This court agrees that an individual employee cannot be lia-

ble for damages under Title VII. *See* 42 U.S.C. § 2000e(b) (defining "employer," for Title VII purposes, as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person").[10] Mukaida concedes that her Title VII claims against Okamura in his individual capacity are not authorized by Title VII. Accordingly, summary judgment is granted in favor of Okamura in his individual capacity on Counts III (quid pro quo harassment) and IV (hostile work environment) of the Complaint to the extent those claims are asserted under Title VII.

2. *Chapter 378 Does not Require Plaintiffs to Obtain Right to Sue Letters From the HCRC as a Prerequisite to Suits for Sexual Harassment.*

■ As a further preliminary matter, the Defendants argue that this court should dismiss Mukaida's Chapter 378 claims because she allegedly failed to exhaust her administrative remedies. UH argues that the Hawaii Civil Rights Commission ("HCRC") dismissed Mukaida's HCRC complaint as untimely and says that Mukaida never received an HCRC right-to-sue letter as a result.[11] Although

---

**9.** Mukaida's Chapter 378 claims of sexual harassment against the State and UH have been dismissed.

**10.** Although Title VII's definition of "employer" includes an agent of the employer, the Ninth Circuit has nevertheless rejected individual liability under Title VII, finding that the reference to an agent was included only so that an employer would be vicariously liable under Title VII for the agent's actions. *Miller*, 991 F.2d at 587 ("[t]he obvious purpose of this [agent] provision was to incorporate respondeat superior liability into the statute") (brackets in original). *Accord Gary v. Long*, 59 F.3d 1391, 1399 (D.C.Cir.1995) ("[W]hile a supervisory employee may be joined as a party defendant in a Title VII

action, that employee must be viewed as being sued in his capacity as the agent of the employer, who is alone liable for a violation of Title VII"), *cert. denied*, 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1281 (7th Cir.1995) ("the actual reason for the 'and any agent' language in the definition of 'employer' was to ensure that courts would impose respondeat superior liability upon employers for the acts of their agents").

**11.** Although Mukaida failed to get a right-to-sue letter from the HCRC, she received a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"), after it found no reasonable grounds for discrimination against Mukaida. *See* Declara-

Mukaida's opposition is not very clear, the court finds that Mukaida did not need to obtain a right-to-sue letter from the HCRC to assert her sexual harassment claims under Chapter 378.

Haw.Rev.Stat. § 378–2 makes various discriminatory practices illegal. Section § 378–4 gives the HCRC "jurisdiction over the subject of discriminatory practices" and allows aggrieved individuals to file complaints with the HCRC "in accordance with the procedure established under chapter 368." Haw.Rev.Stat. § 378–4; *see also* Haw.Rev.Stat. § 368–11. Section 368–12 allows the HCRC to issue a right-to-sue letter. Haw.Rev.Stat. § 368–12 ("Within ninety days after receipt of a notice of right to sue, the complainant may bring a civil action under this chapter"). This provision has been interpreted as requiring a plaintiff to obtain a right-to-sue letter before filing suit in court. *See Linville v. Hawaii*, 874 F.Supp. 1095, 1104 (D.Haw.1994) ("Plaintiff has not presented this Court with notice of any such right-to-sue under H.R.S. §§ 378–2 and 378–62. Thus, Plaintiff's claims under these provisions must also be dismissed as premature").

However, the Hawaii legislature has exempted sexual harassment actions from the exhaustion requirement found in section 368–12. Haw.Rev.Stat. § 378–3

("Nothing in this part shall be deemed to ... [p]reclude any employee from bringing a civil action for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto"). The legislative history clearly indicates that the Hawaii legislature meant to exempt sexual harassment claims from the exhaustion requirement found in Haw. Rev.Stat. § 368–12. A conference committee report states: "The purpose of this bill is to amend Chapters 378 and 386 ... to enable employees to file civil actions premised on sexual harassment or sexual assault arising out of and in the course of employment." Conf.Com.Rep. No. 1231, Reg. Sess. (House Journal 1992). That conference committee report clearly contemplates that civil actions for sexual harassment would be allowed to proceed even if no right-to-sue letter was received by a plaintiff. *Id.* ("the Commission [is allowed] to issue a right to sue letter on a complaint which recites the same facts as those alleged in a civil action. This would eliminate the possibility of two ongoing proceedings related to the same fact situation"). A senate committee report indicates the same purpose. Sen. Com. Rep. No. 2588, Reg. Sess. (Senate Journal 1992) ("Within the first 180 days after the alleged injury, jurisdiction rests primarily with the Hawaii Civil Rights Commission;

tion of Mie Watanabe (May 14, 2001) ¶ 17. The EEOC right-to-sue letter was received by UH on March 5, 1999 (a Friday). Mukaida alleges that she did not receive the right-to-sue letter until March 7, 1999 (a Sunday). First Amended Complaint ¶ 2(c). Under 42 U.S.C. § 2000(e)–5(f)(1), a plaintiff must file his or her action in this court within "ninety days after the giving of such notice." Mukaida filed her original complaint on June 5, 1999, ninety days after she says she received the right-to-sue letter. Although it would be only under unusual circumstances that a claimant might receive a right-to-sue letter from the EEOC on a Sunday, no party has challenged the timeliness of the Complaint

or the accuracy of Mukaida's statement that she received the letter on March 7, 1999. There has been ample opportunity to raise this issue. Because the filing of a complaint within ninety days of receiving a right-to-sue letter is not jurisdictional, the court finds that the Defendants have waived any statute of limitations argument with respect to the filing of the Complaint within the ninety-day period following receipt of the right-to-sue letter. *See Valenzuela v. Kraft, Inc.*, 801 F.2d 1170, 1173–74 (9th Cir.1986), *as amended*, (1987). At the hearing, the Defendants appeared to concede that they had waived this argument by not raising it in the past two years.

however, after 180 days but within the tort statute of limitations, the employee may file a civil action in a court of competent jurisdiction whether or not notice of right to sue has been issued by the Commission pursuant to chapter 368"). Accordingly, the court finds that Mukaida did not have to obtain a right-to-sue letter from the HCRC to bring her Chapter 378 claims for sexual harassment.

3. *Section 378–2 Does Not Authorize a Suit based on Quid Pro Quo Harassment or Hostile Work Environment Discrimination Against Okamura in his Individual Capacity.*

■ Section 378–2(1)(A) prohibits discrimination on the basis of sex. Specifically, it makes it unlawful for "any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise discriminate against any individual in compensation or in the terms, conditions, or privileges of employment." Haw.Rev.Stat. § 378–2(1)(A). Section 378–2(1)(A) therefore prohibits quid pro quo harassment and hostile work environment discrimination.

Because an individual is not an "employer" for purposes of Title VII, Okamura argues that, in his individual capacity, he cannot be an "employer" for purposes of section 378–2(1)(A). Okamura therefore contends that he cannot be individually liable for quid pro quo harassment and hostile work environment discrimination.

■ Mukaida disagrees, citing *Steinberg v. Hoshijo*, 88 Hawai'i 10, 18 n. 10, 960 P.2d 1218, 1226 n. 10 (1998). The court, however, does not read *Steinberg* as standing for the proposition that an individual working for a company is an "employer" for purposes of liability under section 378–2. *Steinberg* only stated, in dicta in a footnote, that "[t]he parties do not dispute that Dr. Steinberg was an agent of the Clinic and therefore an 'employer' [of a nurse] as defined by HRS § 378–1." *Id.* As Mukaida conceded at the hearing, *Steinberg* never actually decided the issue of whether an individual working for a company may be considered an "employer" for purposes of section 378–2. The doctor in *Steinberg* may have waived any argument that he was not an "employer" for purposes of Chapter 378 liability by not raising it in the trial court or on appeal.[12] Indeed, the very reference in *Steinberg* to the lack of a dispute raised by the parties might suggest that the court would have analyzed the issue and might have reached a different conclusion had the issue been raised.

Hawaii courts interpreting Chapter 378 have looked to federal law for guidance. Admittedly, Chapter 378 is not identical to Title VII. *See Furukawa v. Honolulu Zoological Socy.*, 85 Hawai'i 7, 13, 936 P.2d 643, 649 (1997) ("Unlike federal law, however, the State of Hawai'i extends its employment discrimination protection to all employers, not just employers with fifteen or more employees.... The federal courts

12. The court is aware that *Black v. City & County of Honolulu*, 112 F.Supp.2d 1041, 1056–57 (D.Haw.2000), a case in this district by another judge, held that an individual employee may be held liable for violations of Chapter 378. *Black* relied, at least in part, on *Steinberg*, noting that *Steinberg* provided "a strong indication that the Hawaii Supreme Court would interpret [chapter 378] to hold individual employees liable if the issue were put before it." *Id.* This court, however, is not bound by *Black* and does not read *Steinberg* the same way.

It appears that *Black* also premised its holding on two cases decided by the HCRC, both of which found that an individual may be liable for violations of chapter 378. *Black*, 112 F.Supp.2d at 1056. "[C]ourts are not, however, bound by the findings of the HCRC and EEOC." *Takaki v. Allied Mach. Corp.*, 87 Hawai'i 57, 68, 951 P.2d 507, 518 (Ct.App. 1998).

have considerable experience in analyzing these cases, and we look to their decisions for guidance. But, as the California Supreme Court recently observed, federal employment discrimination authority is not necessarily persuasive, particularly where a state's statutory provision differs in relevant detail"). But the differing definitions of "employer" in Title VII and Chapter 378 both contemplate persons who employ others or who have agents. The term "employer," for Title VII purposes, means "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). Haw.Rev.Stat. § 378–1 similarly defines "employer" as "any person ... and any agent of such person, having one or more employees." As noted above, Title VII does not allow suits against individual employees.

This court finds that, if called upon to decide the issue, Hawaii appellate courts would likely follow the federal courts' reasoning in Title VII cases and rule that, under Chapter 378, unless an individual actually employs someone, the individual cannot be liable for quid pro quo harassment or hostile work environment discrimination because the individual is not an "employer." Hawaii courts would likely find that the reference to an agency relationship in the definition of "employer" for purposes of chapter 378 was only meant to impose respondeat superior liability on employers for their agents' acts, as in the Title VII context. *See* n. 11 *supra.*

Mukaida has not introduced any evidence indicating that Okamura was an employer. Under the present record, this court therefore concludes that Okamura cannot be liable in his individual capacity under section 378–2(1)(A). Even assuming that Hawaii courts would impose individual liability on agents of employers, Okamura (in his individual capacity) would be entitled to summary judgment, as Mukaida has failed to introduce any evidence that Okamura was an agent of UH or of the State.

Summary judgment is therefore granted in favor of Okamura (in his individual capacity) on Mukaida's Chapter 378 claims for sexual harassment in Counts III and IV.

4. *In his Official Capacity, Okamura has Eleventh Amendment Immunity from Mukaida's Chapter 378 Claims in Counts III and IV.*

 A suit against a state official in that person's official capacity is the same as an action against a state. *See Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Accordingly, in his official capacity, Okamura has the same Eleventh Amendment immunity as the State. Because this court has already dismissed (on Eleventh Amendment immunity grounds) Mukaida's Chapter 378 claims against the State for quid pro quo harassment (Count III) and hostile work environment discrimination (Count IV), the court also dismisses those claims on Eleventh Amendment immunity grounds to the extent they are asserted against Okamura in his official capacity.

5. *Title VII Claims in Counts III and IV.*

In relevant part, Title VII provides:

(a) It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, *sex,* or national origin.

42 U.S.C. § 2000e-2 (emphasis added).

The EEOC has issued guidelines on whether alleged harassment based on sex violates Title VII. Those guidelines state:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a) (2001) (footnote omitted). The Supreme Court has noted that these guidelines, although not controlling on the courts, "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savs. Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (interpreting 29 C.F.R. § 1604.11(a) (1985) and quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

Traditionally, sexual harassment claims were analyzed as either quid pro quo harassment or hostile work environment discrimination. To establish a prima facie case of quid pro quo sexual harassment, a complainant had to demonstrate that an individual explicitly or implicitly conditioned a job, a job benefit, or the absence of a job detriment on an employee's acceptance of sexual conduct. *Heyne v. Caruso,* 69 F.3d 1475, 1478 (9th Cir.1995). To demonstrate a hostile work environment, a plaintiff had to show that a workplace was permeated with discriminatory intimi-

dation, ridicule, and/or insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive or hostile working environment. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). However, as the law of sexual harassment developed, the Supreme Court concluded that the "terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 751, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

*Ellerth* and its companion case, *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), clarified when an employer is vicariously liable for sexual discrimination under Title VII. In its discussion of this vicarious liability, instead of analyzing claims under the traditional quid pro quo and hostile work environment rubrics, *Ellerth* examined whether a "tangible employment action" had been taken. The Supreme Court stated, "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Ellerth,* 524 U.S. at 753–54, 118 S.Ct. 2131. When no such tangible employment action has been taken, the Supreme Court noted that there must be severe or pervasive conduct for Title VII liability to arise. *Id.* at 554, 118 S.Ct. 2131 ("For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive"). The Supreme Court held that, "[b]ecause Ellerth's claim involves only unfulfilled

threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." *Id.*

Since *Ellerth*, the trend at the appellate court level has been to analyze the alleged sexual harassment based on whether a "tangible employment action" was taken or not taken. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001) ("In *Ellerth* and *Faragher*, the Supreme Court indicated that courts should no longer use the labels 'quid pro quo' and 'hostile environment' to analyze whether an employer should be held liable on an employee's Title VII claim concerning a supervisor's sex-based harassment. Instead, when analyzing whether an employer should be held liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a 'tangible employment action,' such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse 'tangible employment action' is taken but which is sufficient to constructively alter an employee's working conditions") (citation and footnote omitted); *Wolf v. Northwest Indiana Symphony Soc'y*, 250 F.3d 1136, 2001 WL 533798 (7th Cir. May 21, 2001) ("Recently, the Supreme Court abandoned the commonly used categories of hostile work environment harassment and *quid pro quo* harassment, opting instead to distinguish between cases in which the supervisor takes a tangible employment action against the subordinate and those in which she does not"); *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir.2000) ("At the first stop on the *Ellerth/Faragher* road map, courts are required to determine whether the complaining employee has or has not suffered a 'tangible employment action.' If he has, his suit is classified as a 'quid pro quo' case; if he has not, his suit is classified as a 'hostile environment' case") (footnote omitted).

A tangible employment action occurs when there is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 760, 118 S.Ct. 2257. In most cases, a "tangible employment action" inflicts direct economic harm. *Id.* at 762, 118 S.Ct. 2257. A "tangible employment action" is the means by which a supervisor brings the official power of the enterprise to bear on subordinates and requires an official act of the company. *Id.*

██ Mukaida claims that she suffered a "tangible employment action" when she was reassigned to the Outreach College. Mukaida characterizes that reassignment as "undesirable" in her opposition, although she fails to give any details about the nature of the reassignment. *See* Opposition at 6. An "undesirable reassignment" can be a "tangible employment action," *see Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, but not all transfers constitute "tangible employment actions." *Brown v. Brody*, 199 F.3d 446, 457 (D.C.Cir.1999) ("a plaintiff who is made to undertake or who is denied a lateral transfer—that is, one in which she suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncrasies of personal preference are not sufficient to state an injury").

Mukaida does not elaborate on why her transfer to Outreach College was "undesirable." The only evidence in the record indicates that, in 1998, Mukaida was medically authorized to return to work so long

as she had no contact with Okamura. Discussions were then held regarding alternative placement for Mukaida. Mukaida was transferred to Outreach College "with no change in salary or other benefits." Declaration of Michael Hamnett (June 14, 2001) ¶¶ 3–5. Mukaida testified that she enjoyed working at Outreach College, that she was treated well there, and that her duties were not beneath her level of education. Deposition of Edith Laraine Mukaida (Dec. 8, 2000) at 711. Mukaida did not submit any evidence indicating that she did not want the transfer or that it was undesirable in any manner. Under these circumstances, Mukaida has failed to raise a genuine issue of fact regarding whether she suffered a tangible employment action when she was transferred to Outreach College.

■■■ Mukaida next claims that she suffered tangible employment actions when she was hospitalized as a result of her relationship with Okamura. Mukaida says that her hospitalization caused her to exhaust her sick leave, vacation, and leave sharing benefits. At that point, Mukaida says, she went on administrative leave without pay. See Opposition at 7. Although Mukaida did not point to any admissible evidence to that effect, UH submitted a declaration by her supervisor Michael Hamnett, indicating that Mukaida requested and took sick leave and vacation from January 9, 1997, to September 30, 1997. Declaration of Michael Hamnett (May 15, 2001) ¶ 12. After exhausting that leave, Mukaida returned to work. Id. ¶ 13. From January 2 to August 11, 1998, Mukaida was again on paid vacation and sick leave (apparently using some leave sharing benefits also). Id. ¶¶ 16, 23. From August 11, 1998, to November 15, 1999, Mukaida worked at Outreach College. Id. ¶¶ 21, 23. Since November 15, 1999, Mukaida has been on "leave without pay for personal reasons." Id. ¶ 23.

The court does not find that Mukaida's vacation, sick leave, and her leave without pay constitute tangible employment actions. See Dunegan v. City of Council Grove, Kansas Water Dept., 77 F.Supp.2d 1192, 1200 (D.Kan.1999) ("we find no merit to the plaintiff's argument that her own decisions to take a leave of absence or to use her sick leave constitute a 'tangible employment action'"); Finnane v. Pentel of America, Ltd., 2000 WL 288437, *8 (N.D.Ill. March 14, 2000) ("The court also finds that a voluntary leave of absence is not a tangible employment action within the scope of Ellerth").

The court stresses that it is not here saying that Mukaida "volunteered" to use her sick leave or to take leave without pay. The court is instead finding that, even assuming Mukaida could be said to have shown that she exhausted her benefits and took leave without pay, she does not show that the exhaustion of benefits or taking of leave constituted "official acts" by the State or UH. As the Supreme Court has said, a tangible employment action requires an official act by an employer. Ellerth, 524 U.S. at 760, 118 S.Ct. 2257. Thus, even if her leave was involuntary from a medical standpoint, Mukaida also had to show that the leave was involuntary in the sense that, by their "official acts," the State and/or UH forced the leave upon her. In other words, the leave had to result from the bringing of the official power of the State or of UH to bear on her. See id. Mukaida has not shown this.

Because Mukaida has failed to demonstrate that she suffered any tangible employment action, the State and UH are granted summary judgment on her Title VII quid pro quo harassment claim (Count III).

Because she suffered no tangible employment action, Mukaida's claims should be categorized as hostile work environ-

ment claims.[13] *Ellerth,* 524 U.S. at 754, 118 S.Ct. 2257. Such claims require the workplace to be permeated with discriminatory intimidation, ridicule, and/or insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive or hostile working environment. *Oncale,* 523 U.S. at 78, 118 S.Ct. 998; *Montero v. Agco Corp.,* 192 F.3d 856, 860 (9th Cir.1999). To be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find abusive or hostile, and one that the victim did in fact perceive to be so. *Montero,* 192 F.3d at 860. The objective severity "should be judged from the perspective of a reasonable person in the plaintiff's position." *Oncale,* 523 U.S. at 81, 118 S.Ct. 998. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, ——, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001).

> Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* (internal quotations omitted) (noting that an isolated incident involving a statement that "making love to you is like making love to the Grand Canyon" was insufficient to violate Title VII).

The State and UH argue that the alleged sexual harassment was neither objectively nor subjectively so severe or pervasive such that it altered the terms and conditions of Mukaida's employment and created an abusive or hostile working environment. They say that the sexual relationship Mukaida had with Okamura was voluntary and consensual and therefore cannot form the basis of a hostile work environment claim. The Supreme Court has cautioned, however, that the voluntariness of sexual contact, "in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII." *Meritor,* 477 U.S. at 68, 106 S.Ct. 2399. "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Id.* Accordingly, instead of analyzing the voluntariness of Mukaida's relationship with Okamura, the court must focus on the "correct inquiry" into whether Mukaida "by her conduct indicated that the alleged sexual advances were unwelcome." *Id.* As discussed above in the assault and battery section of this order, there is some evidence that at least some of Okamura's conduct was "unwelcome." Accordingly, there is an issue of fact as to whether Okamura's actions objectively and subjectively created a hostile work environment through his allegedly "unwelcome" conduct.

■■■ The court therefore turns to the affirmative defense raised by the State and UH based on *Faragher* and *Ellerth.* The

---

**13.** At the hearing, Mukaida argued that she suffered a tangible employment action when Okamura threatened to leave Peacestat, which she argues was a viable program only if both Mukaida and Okamura worked there. In light of *Ellerth,* however, Mukaida abandoned this argument because this was only an unfulfilled threat. Mukaida conceded that, if she suffered no tangible employment action, her sexual harassment claims could only be viable under the hostile work environment rubric.

Supreme Court has explained that employers, such as the State and UH, are vicariously liable for a hostile work environment created by a supervisor under the following conditions:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher v. City of Boca Raton,* 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Assuming solely for purposes of this analysis that Okamura was Mukaida's supervisor, the State and UH are entitled to take advantage of the affirmative defense set forth in *Ellerth* and *Faragher.* Under *Ellerth* and *Faragher,* this court must first determine whether Mukaida suffered a

tangible employment action. *Montero,* 192 F.3d at 861. As shown above, Mukaida has not shown that a tangible employment action was taken against her. Therefore, the State and UH may rely on the affirmative defense set forth in *Faragher* and *Ellerth.* This court next examines whether the State and UH exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and whether Mukaida unreasonably failed to take advantage of the preventive or corrective opportunities provided. *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

The Declaration of Mie Watanabe (May 14, 2001) sets forth UH's extensive sexual harassment policy. When a person believes that he or she is a victim of sexual harassment, the person is to go through the complaint procedure set up to investigate and address the alleged sexual harassment. Mukaida does not claim that she did not know about UH's sexual harassment policy. Mukaida did not file any complaint pursuant to the procedure until July 1, 1998, after her relationship with Okamura had ended and after all of the alleged contacts by Okamura had occurred.[14] *See* Watanabe Decl. ¶ 14. Because she waited until the harassment had ended, Mukaida never gave the State or UH an opportunity to correct the alleged sexual harassment by Okamura, although the evidence does indicate that UH promptly investigated Mukaida's claims when she eventually did report the alleged sexual harassment. *See* Exhibit 1 to Watanabe Decl. Accordingly, the court finds that 1) UH "exercised reasonable care to prevent and correct promptly any sexually

14. Although Mukaida's Deposition indicates in one part that she told Michael Hamnett about the alleged sexual harassment in December 1996, Mukaida did not demonstrate that this was the correct procedure to follow given UH's sexual harassment policy, which required Mukaida to file a complaint with the Sexual Harassment Committee at UH. *See* Ex. 1 to Watanabe Decl. Nothing in the record suggests that Hamnett was a member of that committee.

harassing behavior," and 2) Mukaida "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257.

Even if Okamura was not Mukaida's supervisor and was instead merely her coworker, UH and the State would still be entitled to summary judgment.[15] Employers are subject to liability for coworker harassment if they know or should know about the harassment and fail to redress that harassment adequately. *See Star v. West,* 237 F.3d 1036, 1038 (9th Cir.2001); *Burrell v. Star Nursery, Inc.,* 170 F.3d 951, 955 (9th Cir.1999) (noting that an employer may only be found liable in a hostile work environment case involving coworkers for what management-level employees "knew or should have known"); 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action").

■ Coworker harassment liability is not based on respondeat superior principles, but instead on the employer's own negligence. *See Mikels v. City of Durham, N.C.,* 183 F.3d 323, 332 (4th Cir.1999) ("absent some elaborate scheme, harassment by a fellow-employee having no authority of any kind over the victim never can be found aided by the agency relation [that formed the basis for the vicarious liability discussed in *Ellerth* and *Faragher* ]; as to such employees, the agency relation provides no aid for their conduct but workplace proximity, and that does not suffice for the purpose. For such unaided harassment, by whomever done, employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it") (internal quotations and citations omitted); *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 441 (2d Cir.1999) (discussing *Faragher* and then concluding, "[i]n contrast, if the harasser is the victim's co-worker, the employer will be liable only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment and did nothing about it") (internal quotation marks omitted); *Wilson v. Chrysler Corp.,* 172 F.3d 500, 508 (7th Cir.1999) ("Liability for co-worker harassment requires a showing of negligence on the part of the employer"); *Sharp v. City of Houston,* 164 F.3d 923, 929 (5th Cir.1999) ("An employer may be liable for sexual harassment if it 'knew or should have known of the harassment in question and failed to take prompt remedial action.' This standard was not disturbed by *Faragher* or *Burlington* ") (internal citation omitted).

Mukaida has failed to show that UH (or the State) was negligent. Mukaida's testimony regarding whether she informed anyone at UH of the alleged sexual harassment is equivocal. In one part of her deposition, she states that she told Hamnett, in mid-December 1996, that: "from spring 1994[,] the relationship with Dr. Okamura became coerced. And I had unwillingly participated in a sexual relationship with him from that period, on." Mukaida Depo. (August 23, 2000) at 48. But later, Mukaida denies that she told Ham-

---

15. The court notes that Mukaida is seeking to hold UH and the State vicariously liable for Okamura's actions, arguing that Okamura was her supervisor and not her coworker. The court sets forth an analysis of coworker harassment liability only because Mukaida has not demonstrated that Okamura was, in fact, her supervisor.

nett about her sexual relationship with Ok-amura:

Q: Did you tell Dr. Hamnett in 1996 that you were having sex with Dr. Okamura and it was unwelcome on your part?

A: No. Because I was afraid it would get back, that he would ask Dr. Okamura it if was true.

Mukaida Deposition (October 11, 2000) at 673. Because this is a motion for summary judgment, the court must interpret the facts in the light most favorable to Mukaida, the nonmoving party. Accordingly, even though she is not clear on whether she told Hamnett about the alleged sexual harassment, the court, for purposes of this motion, will assume that she did tell him.

Even assuming that Mukaida put UH on notice of the alleged sexual harassment by allegedly telling Hamnett about that harassment on December 18, 1996, UH is still entitled to summary judgment on any claim that UH was negligent in not remedying that harassment. Mukaida has not introduced any evidence showing that UH failed to remedy the alleged harassment. A few weeks after she allegedly told Hamnett about the harassment in December 1996, Mukaida stopped working. *See* Declaration of Michael Hamnett (May 16, 2001) ¶ 11 (on December 31, 1996, Mukaida told Hamnett that "she could not return to work because of the excessive stress she was feeling because of overwork"); *Id.* ¶ 12 (beginning January 9, 1997, and running through September 30, 1997, Mukaida took a combination of vacation and sick leave, leaving for the Menninger Clinic in Kansas). Mukaida has not pointed to anything in the record indicating that, for the brief period from December 18, 1996, when she says she complained to Hamnett, until January 9, 1997, when she went on vacation and took sick leave, Okamura continued to harass her such that UH should

have done something about that harassment.

Mukaida returned to work on October 1, 1997. *Id.* ¶ 13. During the nine months Okamura was not working (from January 9, 1997, through September 30, 1997), UH cannot have been negligent in failing to take steps to prevent Okamura from harassing her. After Mukaida returned to work on October 1, 1997, Hamnett says that he checked with Mukaida "at least once a week and inquired whether matters were alright at work. [Mukaida] always responded by stating that everything was alright." *Id.* ¶ 15. Mukaida offers no evidence to the contrary in connection with this time period. It cannot be said that UH failed to correct harassing behavior when Mukaida affirmatively told Hamnett that nothing was wrong.

Mukaida then left employment at UH again on January 2, 1998, returning to work at her temporary assignment at Outreach college on August 11, 1998. *Id.* ¶¶ 16–17. Again, UH cannot be liable for allegedly failing to take steps to prevent Okamura from harassing Mukaida during the time Mukaida was not at work.

When Mukaida returned to work at Outreach College, from August 11, 1998, through the fall of 1999, *see id.* ¶ 21, Mukaida did not work at Peacestat, where Okamura worked. *Id.* ¶ 24. The evidence before this court indicates that this transfer was an accommodation to keep Mukaida from having to work with Okamura. Declaration of Michael Hamnett (June 14, 2001) ¶ 5. Because UH ensured that Okamura and Mukaida would not be working together, and because Mukaida offers no evidence of harassment on or after August 11, 1998, UH cannot be liable for allegedly failing to take steps to remedy any alleged harassment during this period.

The State and UH are therefore not liable for Okamura's alleged sexual harass-

ment and are entitled to summary judgment on Mukaida's hostile work environment claim (Count IV). No part of Count III or IV remains.

### D. *Retaliation and Denial of Equal Employment Opportunities Claims.*

In Counts V and VI, Mukaida alleges Title VII claims for retaliation and denial of equal employment opportunities, respectively.[16] As discussed above, Mukaida conceded that no Title VII claim could be asserted against Okamura in his individual capacity because he does not qualify as an "employer" for purposes of Title VII. Accordingly, summary judgment is granted in favor of Okamura in his individual capacity on Counts V and VI.

#### 1. *Retaliation.*

Retaliation claims under Title VII are based on section 2000e–3, which states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). To make out a prima facie retaliation case, Mukaida must show (1) that she engaged in a protected activity, (2) that her employer subjected her to an adverse employment action, and (3) that the protected activity and the employer's action are causally linked. *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir. 2000); *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 919 (9th Cir.1996), *cert. denied,* 522 U.S. 950, 118 S.Ct. 369, 139

L.Ed.2d 287 (1997). If a plaintiff asserts a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its action. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. *Ray,* 217 F.3d at 1240.

■ Defendants argue that Mukaida cannot state a prima facie claim of retaliatory discrimination. This court agrees. While Mukaida engaged in a protected activity when she lodged her sexual harassment complaints with UH, Mukaida has not demonstrated that she suffered an adverse employment action or that her protected activity was causally linked to action by the State or UH.

The Ninth Circuit has recently noted that the appellate circuits are split as to what constitutes an adverse employment action. *Ray,* 217 F.3d at 1240. The EEOC defines "adverse employment action" to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray,* 217 F.3d at 1242–43 (quoting EEOC Compliance Manual, Section 8, "Retaliation," ¶ 8008 (1998)). Although the Ninth Circuit noted that EEOC Guidelines are not binding on courts, it stated that they constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. *Id.* at 1243. Because the EEOC standard was consistent with prior Ninth Circuit case law and effectuated the language and purpose of Title VII, the Ninth Circuit adopted it, holding that "an action is cognizable as an adverse employment action if it

---

16. Based on Haw.Rev.Stat. § 304–6, this court has previously granted summary judgment to the State on these claims to the extent they were based on acts or omissions occur-

ring on or after July 1, 1998. Mukaida indicated at the hearing that these claims are not being asserted against Okamura in his official capacity.

is reasonably likely to deter employees from engaging in protected activity." *Id.*

Mukaida says that her transfer to Outreach College constituted an adverse employment action. As discussed above, however, Mukaida has not provided this court with any details concerning that transfer. The sole evidence before the court with regard to the transfer is that Mukaida was transferred to Outreach College "with no change in salary or other benefits." Declaration of Michael Hamnett (June 14, 2001) ¶¶ 3–5. As noted earlier, Mukaida testified that she enjoyed working at Outreach College, that she was treated well there, and that her duties were not beneath her level of education. Deposition of Edith Laraine Mukaida (Dec. 8, 2000) at 711. At most, this court can infer from this evidence that Mukaida was subject to a lateral transfer.

The court recognizes that a lateral transfer is indeed sometimes an adverse employment action. *Ray,* 217 F.3d at 1241 ("We therefore reject the government's assertion that a lateral transfer cannot be an adverse employment action for the purposes of Title VII"). However, lateral transfers are not necessarily adverse employment actions. *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 919 (9th Cir. 1996) (declining to recognize a transfer to a different department without loss of salary or benefits as an adverse employment action for purposes of a retaliation claim), *cert. denied,* 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 n. 6 (9th Cir.1994) (expressing doubt that a transferred employee who was not demoted, put in a worse job, or given any additional responsibilities suffered an adverse employment action for purposes of a retaliation claim), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995).

Mukaida has not introduced any evidence indicating that the transfer involved anything unfavorable or that it was not voluntary. Accordingly, the court concludes that Mukaida did not suffer any adverse employment action because she has failed to demonstrate that similar transfers would be "reasonably likely to deter the charging party or others from engaging in protected activity." *Ray,* 217 F.3d at 1242–43.

Even if Mukaida did suffer an adverse employment action when she was transferred to Outreach College, she does not establish the necessary causal link between the transfer and her protected activity (the submission of a complaint about sexual harassment). The record before this court indicates that Mukaida was medically authorized to return to work in 1998 as long as she had no contact with Okamura. Following discussions about where Mukaida would be placed, Mukaida was transferred to Outreach College. Hamnett Decl. ¶¶ 3–5. Mukaida has failed to introduce any evidence suggesting that UH or the State transferred her in retaliation for her submission of a sexual harassment complaint.

Similarly, Mukaida has failed to establish that UH subjected her to an adverse employment action when she exhausted her sick leave, vacation, and leave sharing benefits, and took administrative leave without pay. Mukaida has failed to submit evidence indicating that the use of benefits or the leave without pay constitute actions to which UH or the State subjected her. Those "actions" were not actually taken by UH or the State. Mukaida has also failed to demonstrate any causal connection between these actions and the submission of her complaint.

Accordingly, Mukaida has failed to establish a prima facie claim of retaliation, and summary judgment is granted on Count V in favor of UH and in favor of the State (with respect to Count V's claims

based on acts and omissions occurring before July 1, 1998, which were not dismissed by this court's earlier order). This leaves no part of Count V for further adjudication.

### 2. *Denial of Equal Employment Opportunities Claim.*

A claim that equal employment opportunities were denied falls under section 2000e–2(a)(2) of Title VII, which states:

It shall be an unlawful employment practice for an employer ... to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(2). An employee may prove an employer's Title VII liability under section 2000e–2(a)(2) through a theory of disparate treatment or a theory of disparate impact.[17] *Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477, 1480 (9th Cir. 1987) (en banc). Proof of disparate treatment requires a showing that the employer intentionally "treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Id.* Because Mukaida has failed to show that she was treated less favorably than others because of her sex, summary judgment is granted in favor of UH and the State (to the extent the claims arise from acts or omissions occurring before July 1, 1998).

This leaves no part of Count VI for further adjudication.

### E. *Section 1983 and Section 1985 Violations.*

In Counts VII and VIII, Mukaida alleges violations of 42 U.S.C. §§ 1983 and 1985.[18] As discussed above, the only portions of these counts that remain are the claims against Okamura in his individual capacity and the claims for prospective injunctive relief against UH.

To the extent Mukaida's claims are asserted against Okamura in his individual capacity, he has qualified immunity from those claims. Qualified immunity bars claims against state officials in their individual capacities if their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Manhattan Beach Police Officers Ass'n, Inc. v. City of Manhattan Beach,* 881 F.2d 816, 818 (9th Cir.1989) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The doctrine protects state and local officials from their exercise of poor judgment, and fails to protect only those who are "plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The purpose of qualified immunity is to protect officials from undue interference with their duties and from potentially disabling threats of liability. *Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 70 F.3d 1095, 1098 (9th Cir.1995). The Su-

---

**17.** Disparate impact is not at issue in this case.

**18.** The section 1983 and 1985 claims alleged against the State were previously dismissed based on the Eleventh Amendment and on section 304–6. The court previously dismissed the section 1983 and 1985 claims based on Eleventh Amendment immunity to the extent they were alleged against UH and

arose from acts or omissions before July 1, 1998. Earlier in this order, the court dismissed claims against UH relating to acts or omissions after that date, retaining only the claims against UH that sought prospective injunctive relief. At the hearing, Mukaida indicated that she is not asserting her section 1983 and 1985 claims against Okamura in his official capacity.

preme Court has therefore stated that qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. *Saucier v. Katz,* —— U.S. ——, ——, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, —— (2001). For that reason, the Supreme Court has cautioned that a ruling on a qualified immunity defense "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Id.*

*Saucier* held that the qualified immunity analysis is a two-step process. First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the defendant's conduct violated a constitutional or statutory right? [19] *Id.* If no constitutional or statutory right would have been violated by the alleged actions, a defendant has qualified immunity. On the other hand, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This inquiry "must be taken in light of the specific context of the case, not as a broad general proposition." *Id.* If the law did not put the official on notice that his or her conduct would be clearly unlawful, the official has qualified immunity from the claim. *Id.* at 2156–57.

Even viewed in the light most favorable to Mukaida, *see Saucier,* —— U.S. at ——, 121 S.Ct. at 2156, the record does not demonstrate a violation by Okamura of a clearly established constitutional or statutory right. Mukaida did not allege or

argue that Okamura's conduct violated any specific constitutional provision. Her Complaint can only fairly be read as basing the section 1983 and 1985 claims on the alleged Title VII violations, as that is the only federal statutory claim asserted prior to Counts VII and VIII, which both incorporate only prior allegations in the Complaint. Because the Title VII claims no longer remain, and because the only substantive claims remaining are Mukaida's assault and battery claims against Okamura in his individual capacity, there are no claims remaining for violations of the Constitution or a statute. Accordingly, the Complaint can no longer be read as alleging any constitutional or statutory violation that could form the basis of a section 1983 or 1985 claim.[20] Okamura therefore has qualified immunity from those claims.

Mukaida's section 1983 and 1985 claims against UH for prospective injunctive relief must similarly fail. UH cannot, under section 1983 or 1985, enjoin actions that neither UH nor Okamura is presently taking. Having failed to demonstrate that anyone is now violating a clearly established constitutional or statutory right to her detriment, Mukaida cannot demonstrate that UH must stop those actions under section 1983 or 1985. Indeed, Mukaida does not show that anyone is now taking any wrongful action at all against her. Thus, no part of Count VII or Count VIII remains for further adjudication.

**19.** Although *Saucier's* qualified immunity analysis only examined whether a violation of a constitutional right is alleged, this court also examines whether a statutory right has been alleged. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727 ("government official performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known").

**20.** Moreover, Mukaida has failed to demonstrate a viable section 1983 or 1985 claim, as she has not shown that Okamura was acting under color of law. Mukaida has also failed to allege a proper section 1985 claim because she has not shown that two or more people conspired or agreed to deprive her of a constitutional right.

### F. *Emotional Distress Claims.*

In Counts IX and X, Mukaida alleges intentional and negligent infliction of emotional distress. The only portions of these claims remaining are the claims against Okamura in his individual capacity.

To recover for intentional infliction of emotional distress, Mukaida must prove: (1) that Okamura's actions that allegedly caused her harm were intentional; (2) that Okamura's actions were unreasonable; and (3) that Okamura should have recognized that his actions were likely to result in illness. *Wong v. Panis,* 7 Haw.App. 414, 421, 772 P.2d 695, 700 (Ct.App.1989). "An act is unreasonable if it is without just cause or excuse and beyond all bounds of decency[.] In other words, the act complained of must be outrageous." *See Takaki v. Allied Mach. Corp.,* 87 Hawai'i 57, 66 n. 13, 951 P.2d 507, 516 n. 13 (1998). In explaining the type of "outrageous" conduct that gives rise to a claim for intentional infliction of emotional distress, the Hawaii Supreme court has noted:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his re-

sentment against the actor, and lead him to exclaim, "Outrageous!"

*Dunlea v. Dappen,* 83 Hawai'i 28, 38, 924 P.2d 196, 206 (1996).

To prove her claim of negligent infliction of emotional distress, Mukaida must demonstrate: (1) that Okamura engaged in negligent conduct; (2) that Mukaida suffered serious emotional distress; and (3) that such negligent conduct of Okamura was a legal cause of the serious emotional distress. *Tran v. State Farm Mut. Auto. Ins. Co.,* 999 F.Supp. 1369, 1375 (D.Haw.1998). A cognizable claim for negligent infliction of emotional distress under Hawaii law also "requires a physical injury to either a person or property," *see Calleon v. Miyagi,* 76 Hawai'i 310, 320, 876 P.2d 1278, 1288 (1994) (as amended by grant of reconsideration on July 15, 1994).[21]

Mukaida's claims of emotional distress arise out of the alleged conduct discussed above. Because this court has found that an issue of fact exists regarding whether Okamura's conduct was consensual or unwelcome, and because Mukaida's claims of emotional distress are derivative of her remaining assault and battery claims, the court denies summary judgment to Okamura (in his individual capacity) on Mukaida's emotional distress claims. *See Gold v. Harrison,* 88 Hawai'i 94, 103, 962 P.2d 353, 362 (1998) ("The Plaintiffs' claims of false light/invasion of privacy, punitive/exemplary damages, intentional infliction of emotional distress, and negligence were all derivative claims based on the Plaintiffs' claim that Harrison's Statement was defamatory, and, as Harrison's Statement was not defamatory, these claims must also fail"), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1254, 143 L.Ed.2d 351 (1999); *Torres*

---

**21.** If a negligent infliction of emotional distress claim is premised on an injury solely to property or material objects, a plaintiff would also have to show a resulting physical injury or a mental illness. *See* Haw.Rev.Stat. § 663–8.9.

*v. Northwest Eng'g Co.*, 86 Hawai'i 383, 405, 949 P.2d 1004, 1026 (Ct.App.1997) ("Plaintiffs are thus correct in maintaining that [negligent infliction of emotional distress] claims are separable and independent for purposes of calculating damages. However, since their claims are still 'derivative in the sense that they arise out of an alleged tortious injury to' Torres, their claims would be barred if, upon remand, Northwest were determined not to be liable to Torres on any of the theories of recovery alleged by Plaintiffs").

### G. *Negligent Supervision, Training, Retention, and Failure to Remedy Sexual Harassment claims.*

Counts XI, XII, XIII, and XV allege that the State and UH were negligent in supervising, training, and retaining Okamura, and in failing to remedy her sexual harassment claims. These claims were dismissed on Eleventh Amendment grounds. Mukaida clarified at the hearing that these claims are not being asserted against Okamura in either his individual or his official capacity. There are therefore no issues remaining at all in Counts XI, XII, XIII, and XV.

### H. *Count XIV (Aiding and Abetting Discrimination).*

 Haw.Rev.Stat. § 378–2(3) makes it unlawful for "any person whether an employer, employee, or not, to aid, abet, incite, compel, or coerce the doing of any of the discriminatory practices forbidden by this part, or to attempt to do so." [22]

Because Okamura in his official capacity has the same Eleventh Amendment immunity as the State, Count XIV is dismissed on Eleventh Amendment immunity grounds to the extent it is alleged against Okamura in his official capacity. This leaves for adjudication Mukaida's claim against Okamura in his individual capacity.

Because Mukaida has failed to identify any discriminatory practice by anyone other than Okamura, and because Okamura could hardly be liable for aiding and abetting himself, Mukaida cannot state a claim against Okamura in his individual capacity for aiding and abetting a discriminatory practice. Accordingly, summary judgment is granted in favor of Okamura on Count XIV.

### I. *Remaining Claims (Prayers for Relief).*

Mukaida's only remaining claims are state law claims against Okamura in his individual capacity for battery (Count I), assault (Count II), and emotional distress (Counts IX and X). Okamura in his individual capacity is entitled to summary judgment on "Count XVIII" (declaratory relief), which is irrelevant to the remaining claims, and on "Count XIX" (injunctive relief), which is similarly irrelevant, is not sought, and, in any event, could not be awarded by this court. *See Pennhurst,* 465 U.S. at 104–07, 104 S.Ct. 900 (holding that the Eleventh Amendment does not bar claims for prospective injunctive relief provided the claims assert violations of federal law). "Count XVI" (special and general damages) and "Count XVII" (punitive damages) [23] remain for adjudication

---

**22.** Although Mukaida alleges a violation of Haw.Rev.Stat. § 378–2(6) (denial of equal jobs or benefits based on a known disability), the text of her allegations makes it clear that she is alleging a violation of section 378–2(3) (aiding and abetting discriminatory practices).

In its previous order, this court dismissed the claims in Count XIV against the State and against UH for acts and omissions before July

1, 1998. Earlier in this order, the court dismissed this claim against UH for occurrences on and after July 1, 1998.

**23.** Even if the Title VII claims against the State Defendants remained, punitive damages would not have been available against them. To the extent the court's earlier order in this case did not so indicate, it should have. Under 42 U.S.C. § 1981a(b)(1), punitive damages under Title VII are prohibited against "a

only to the extent they are asserted against Okamura in his individual capacity.[24]

## V. *CONCLUSION.*

For the reasons set forth above, judgment in favor of the State, UH, and Okamura in his official capacity is granted on all claims against those Defendants.[25]

The court also grants in part and denies in part Okamura's motion. Summary judgment is granted to Okamura in his individual capacity on all claims except those for battery (Count I), assault (Count II), and emotional distress (Counts IX and X). The only remaining remedies are found in "Count XVI" (special and general damages) and "Count XVII" (punitive damages).

Claims against the Doe Defendants are dismissed, and any claim not expressly reserved in this order for further adjudication is dismissed.

IT IS SO ORDERED.

government, government agency or political subdivision." *See Robinson v. Runyon,* 149 F.3d 507, 516 (6th Cir.1998) ("Congress amended Title VII in 1991 to permit punitive damages in Title VII actions. The amendment however specifically exempted governments, government agencies and political subdivisions"); *Baker v. Runyon,* 114 F.3d 668, 669 (7th Cir.1997) ("As codified at 42 U.S.C. § 1981a(b)(1), Title VII provides that parties may recover punitive damages against a respondent (other than a government, government agency or political subdivision)") (internal quotation omitted), *cert. denied,* 525 U.S. 929, 119 S.Ct. 335, 142 L.Ed.2d 277 (1998);

*Erickson v. West,* 876 F.Supp. 239, 244 (D.Haw.1995) ("punitive damages against the federal government are not allowed under either the old or new version of Title VII").

24. As the only remaining substantive claims are alleged torts committed by Okamura in his individual capacity, no damage claims against UH and the State remain.

25. As noted above, judgment against the State Defendants is based on dismissal with respect to some claims, and summary judgment with respect to others.